# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

The America Channel, LLC,  Civil No. 06-2175 (DWF/SRN)

Plaintiff,

v.  **MEMORANDUM
OPINION AND ORDER**

Time Warner Cable, Inc., Time Warner NY
Cable, LLC, Time Warner, Inc., and
Comcast Corporation,

Defendants.

_____

Daniel R. Shulman, Esq., and Jeremy L. Johnson, Esq., Gray, Plant, Mooty, Mooty &
Bennett, PA, and Joseph M. Alioto, Esq., Alioto Law Firm, counsel for The America
Channel, LLC.

Andrew G. Gorden, Esq., J. Adam Skaggs, Esq., and Jay Cohen, Esq., Paul, Weiss,
Rifkind, Wharton & Garrison, LLP, and Peter J. Gleekel, Esq., Winthrop & Weinstine,
PA, counsel for Time Warner Cable, Inc., Time Warner NY Cable, LLC, and Time
Warner, Inc.

Arthur J. Burke, Esq., Kevin C. Wallace, Esq., Michael P. Carroll, Esq., and Kavita
Kumar, Esq., Davis, Polk, & Wardwell, and Robert E. Cattanach, Esq. and Sarah J.
Kerbeshian, Esq., Dorsey & Whitney, LLP, counsel for Comcast Corporation.

_____

# INTRODUCTION

Plaintiff The America Channel, LLC ("TAC") commenced this antitrust action

against Defendants Time Warner Cable, Inc., Time Warner NY Cable, LLC, and Time

Warner, Inc. (collectively, "Time Warner[1]") and Defendant Comcast Corporation

("Comcast"), after Time Warner and Comcast (collectively, "Defendants") refused to

carry TAC's programming on their cable systems.  This matter came before the Court on

December 8, 2006, pursuant to Time Warner and Comcast's Motion to Dismiss.  For the

reasons set forth below, the Court grants the motion.

## BACKGROUND

## I.    Allegations in the Complaint

Time Warner is the second largest operator of cable systems in the United States,

and it also owns and operates nine cable networks, such as TBS, TNT, Cartoon Network,

CNN, and HBO.[2]  (Compl. at  ¶¶ 4-9.)  Comcast owns a portion of Time Warner.

(*Id.* ¶ 4.)  Comcast is the largest operator of cable systems in the United States, and it

owns and operates six cable networks, including E! Entertainment Television, The Style

Network, and The Golf Channel.  (*Id.*, ¶¶ 8-9.)  According to the Complaint, directly or

indirectly, Time Warner serves more than 13 million cable customers, and Comcast

serves more than 21 million video subscribers, 8 million high-speed internet subscribers,

and 1 million phone subscribers.  (*Id.*, ¶¶ 4, 8.)

In January 2003, TAC was formed to operate a new cable network called The

---

(Footnote Continued From Previous Page)

1      The Court need not distinguish between the Time Warner defendants in this Order.

2      A cable system is  "a facility, consisting of a set of closed transmission paths and associated signal generation, reception, and control equipment that is designed to provide cable service that includes video programming and is provided to multiple subscribers within a community" that is operated by a cable operator, such as Time Warner or Comcast.  (Compl. at ¶ 12.)  A cable network is "a supplier of video programming over a 24-hour or shorter multi-hour period to be carried by cable systems on a single broadcast channel."  (*Id.*, ¶ 20.)

(Footnote Continued on Next Page)

America Channel, which would tell the personal stories of Americans in the 21st century 24-hours a day, 365-days a year.  (*Id.*, ¶ 3.)  Although it has not yet been launched on any cable system, it is "ready, willing and able to launch and commence broadcasting."  (*Id.*, ¶ 3.)  To date, Time Warner and Comcast have refused to carry TAC's programming on their cable systems.  (*Id.*, ¶¶ 1, 44.)

In April 2005, Time Warner and Comcast jointly bid to acquire the assets of Adelphia Communications, Corp. ("Adelphia"), the fifth largest operator of cable systems in the United States, for $17.6 million.  (*Id.*, ¶ 29.)  As part of the deal, Time Warner and Comcast agreed to divide the Adelphia assets between themselves and to swap other cable systems between themselves.  (*Id.*, ¶ 31.)  According to TAC, that agreement specifically included a swap pursuant to which Time Warner, who had a "cable system monopoly in Minneapolis, Minnesota" would give Comcast, who had "a cable system monopoly in St. Paul, Minnesota," Time Warner's rights to the Minneapolis area.  (*Id.* at 30.)  In addition, as described in detail in the Complaint, this agreement allowed Defendants to increase their market share in key areas throughout the United States.  (*Id.*, ¶ 32.)

At the time of the Time Warner-Comcast bid, Adelphia was in bankruptcy in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").  (*Id.*, ¶ 31.)  Prior to Time Warner and Comcast's bid, Cablevision Systems

(Footnote Continued From Previous Page)

Corp., another cable systems operator, had submitted a bid to buy the Adelphia assets for $17.1 million.  (*Id*., ¶ 29.)  In addition, in the spring of 2004, TAC alleges that it commenced negotiations with Adelphia for it to carry The America Channel on its cable system and that Adelphia broke off those talks in May 2004 by telling TAC that it could not carry The America Channel unless Time Warner and Comcast did the same.  (*Id*., ¶ 35.)

## II.    Procedural History

TAC filed its five-count Complaint[3] in this Court on May 30, 2006, with the express purpose of attempting to enjoin the Time Warner-Comcast purchase of Adelphia's assets.  (*See generally* Compl.)  In response to the Complaint, on June 1, 2006, the Debtors in the Bankruptcy Court action sought a temporary restraining order ("TRO") from the Bankruptcy Court blocking TAC and its attorneys from proceeding with this action because their actions violated §§ 362(a)(3) and 105 of the Bankruptcy Code.  *In re Adelphia Comm. Corp.*, 2006 WL 1529357 at * 1 (Bankr. S.D.N.Y. June 5, 2006).  The Bankruptcy Court agreed and granted the TRO on June 2, 2006, enjoining TAC and its attorneys from prosecuting this action in Minnesota. *See id*.

---

3    The Complaint is not organized into traditional counts, which makes it confusing to know what claims are actually being alleged.  Instead, TAC first makes general allegations and then has a section entitled "Violations of Law Alleged."  Viewing the Complaint in the light most favorable to TAC, the Court interprets the Complaint as alleging five counts, as described below.

(Footnote Continued on Next Page)

On that same day, TAC filed a motion in this Court, seeking to collaterally attack the Bankruptcy Court's Order by attempting to have this Court vacate the Bankruptcy Court's June 2, 2006 Order and quash its service. (*See* Doc. No. 2.) Sometime thereafter, this Court spoke with the Bankruptcy Court to ensure that each court was aware of the parties' activities in both courts. On June 5, 2006, the Debtors moved to find TAC and its attorneys in contempt of court for violating the Bankruptcy Court's June 2, 2006 Order by filing their motion to quash. *See In re Adelphia Comm. Corp.*, 345 B.R. 69, 74 (Bankr. S.D.N.Y. 2006). Later that day, the Bankruptcy Court found TAC and its attorneys in contempt but declined to impose coercive measures after one of TAC's attorneys agreed to withdraw its motion before this Court. *Id.* In its June 26, 2006 Order, the Bankruptcy Court refined the scope of its injunction against TAC and its attorneys by preventing them from seeking to enjoin the Time Warner-Comcast asset purchase but allowing them to proceed with some of TAC's claims in this Court so long as those claims did not violate § 362(a)(3) of the Bankruptcy Code. *Id.* at 86-87.

Over TAC's objections, the Federal Trade Commission ("FTC") and Federal Communications Commission ("FCC") approved the terms of the Time Warner-Comcast asset purchase on January 31, 2006, and on July 21, 2006, respectively. On July 31, 2006, Time Warner and Comcast completed their purchase of the Adelphia assets. (Compl.

---

(Footnote Continued From Previous Page)

¶ 31.)  On August 15, 2006, Time Warner and Comcast jointly filed a motion to dismiss

TAC's Complaint for failure to state a claim upon which relief can be granted.  The

parties presented their arguments to the Court on that motion on December 8, 2006.

## DISCUSSION

### I.      Rule 12(b)(6) Motion

A court may consider the complaint, matters of public record, orders, materials

embraced by the complaint, and exhibits attached to the complaint in deciding a motion to

dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  *See Porous Media*

*Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).  In deciding a motion to

dismiss, a court assumes all facts in the complaint to be true and construes all reasonable

inferences from those facts in the light most favorable to the complainant.  *Morton v.*

*Becker,* 793 F.2d 185, 187 (8th Cir. 1986).  In doing so, however, a court need not accept

as true wholly conclusory allegations, *Hanten v. School District of Riverview Gardens*,

183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions drawn by the pleader from the

facts alleged.  *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990).  "[A]

complaint should not be dismissed for failure to state a claim unless it appears beyond

doubt that the plaintiff can prove no set of facts in support of his claim which would

entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

### II.     Request for Relief to Enjoin the Time Warner-Comcast Asset Purchase

In Count One, entitled "Sherman Act, Sections 1, 2:  Adelphia Transaction,"  TAC

alleges the following:

> The defendants' acquisition of Adelphia and planned division of the markets and customers described hereinabove constitute a conspiracy in unreasonable restraint of trade in the relevant markets in violation of Section 1 of the Sherman Act, and a conspiracy to monopolize the relevant markets in violation of Section 2 of the Sherman Act, by reason of which TAC is subjected to a significant threat of injury from defendants' violations, and is therefore entitled to a preliminary injunction and permanent injunction against the consummation of the Adelphia acquisition and planned division of markets and customers, together with TAC's cost of suit, including a reasonable attorney's fee.

(Compl. ¶ 49.)  In Count Two, entitled "Clayton Act, Section 7:  Adelphia Transaction,"

TAC alleges the following:

> The defendants' acquisition of Adelphia described hereinabove constitutes a violation of Section 7 of the Clayton Act, in that defendants' acquisition of the Adelphia cable systems will have the effect of substantially lessening competition, or tending to create a monopoly, in those local cable system markets where the Adelphia cable systems operate, and in the national cable network market, in which TAC competes with defendants; by reason of which TAC is subjected to a significant threat of injury from defendants' violation, and is therefore entitled to a preliminary injunction and permanent injunction against the consummation of the Adelphia acquisition, together with TAC's cost of suit, including a reasonable attorney's fee.

(*Id.* ¶ 50.)

Time Warner and Comcast contend that Counts One and Two should be dismissed

for failure to state a claim because now that Time Warner and Comcast have purchased

Adelphia's assets, the relief TAC seeks—"a preliminary and permanent injunction against

the consummation of the Adelphia acquisition"—is unavailable.  Moreover, under the

Bankruptcy Court's June 26, 2006 Order, they assert that TAC is enjoined from

proceeding with these claims.  *See In re Adelphia*, 345 B.R. at 87 ("[TAC's] efforts to

enjoin the sale of the assets of the Adelphia estate that is the underpinning of its reorganization cannot continue.").  In response, TAC argues that because the Bankruptcy Court specifically stated that TAC is permitted to seek money damages and divesture of the Adelphia asset purchase, Counts One and Two are not moot.  *See id.* at 86 ("this Court will permit claims for damages to proceed too.  And the Court will even permit TAC to seek divestiture, after Adelphia has successfully realized on the value of its assets.").  At the motion hearing, it conceded that it could not seek to enjoin the asset purchase.

The Court agrees with Time Warner and Comcast.  While the Bankruptcy Court did allow TAC to proceed with claims seeking money damages or divesture, it specifically enjoined TAC from seeking an injunction against the Time Warner-Comcast asset purchase.  TAC did not appeal that ruling.  TAC apparently believes that the Bankruptcy Court's Order somehow converted its Complaint in this Court into a request for divesture.  It did not.  The Time Warner-Comcast asset purchase was finalized on July 31, 2006.  Since then, TAC, as master of its complaint, has not amended its pleadings to seek divesture of the asset purchase or money damages flowing from the asset purchase.  The only relief TAC seeks in Counts One and Two is unavailable; thus, these claims must fail because they are moot.  *See, e.g., Blue Cross and Blue Shield of Minn. v. GlaxoSmithKline*, *PLC*,  2006 WL 516784 at * 5 (D. Minn. Jan. 30, 2006) (finding plaintiff's request for injunctive relief moot); *Metromedia Steakhouses Co. v. Resco Mgmt, Inc.*, 168 B.R. 483, 488 (D.N.H. 1994) (same).  The Court therefore grants Time Warner and Comcast's motion with respect to Counts One and Two.

### III.      Standing For Claims Based on Harm to Cable Subscribers and Bid-Rigging

According to TAC, "[t]he conduct of Time Warner and Comcast . . . has caused injury to competition in that it has enabled Time Warner and Comcast to increase prices to cable system subscribers above levels where prices would otherwise be in the absence of defendants' conduct . . . ."  (Compl. ¶ 46.)  Time Warner and Comcast assert that, to the extent Counts Three and Four are based on alleged harm to cable subscribers, TAC lacks standing to raise such claims.  TAC did not respond to this argument.

Section 4 of the Clayton Act gives a private individual or corporation standing to allege an antitrust action and recover treble damages if that individual's business or property is injured by a violation of the antitrust laws, including the Sherman Act.  *See* 15 U.S.C. §§ 12 and 15(a).  Despite the broad language of § 4, the United States Supreme Court has held that § 4 does not "allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property."  *Blue Shield of Va. v. McCready*, 457 U.S. 465, 477 (1982).

Rather, a private plaintiff must demonstrate that he has suffered an "antitrust injury" as a result of a defendant's alleged conduct and that he has standing to pursue a claim under the federal antitrust laws.  *In re Canadian Import Antitrust Litigation*, 470 F.3d 785, 791 (8th Cir. 2006).  An antitrust injury must "reflect the anticompetitive effect either of the violation or of the anticompetitive acts made possible by the violation" and represent "the type of loss that the claimed violations . . . would be likely to cause."  *Id.* (internal citations and quotations omitted).  To determine whether the requirements of

antitrust standing are satisfied, a court must consider "the causal connection between the alleged antitrust violation and harm to the plaintiff, the directness or indirectness of the asserted injury, and the degree to which the alleged damages are speculative in a § 4 action." *Id.*

Here, Time Warner and Comcast concede that TAC has alleged an injury of the type that the antitrust laws were intended to prevent—namely, the increase in prices charged to cable subscribers. They argue, however, that TAC lacks standing to raise such a claim because TAC was not harmed by any alleged price increase. Assuming all facts in the Complaint to be true and viewing them in the light most favorable to TAC, the Court agrees with Defendants. There is simply no causal relationship between the harm alleged to cable subscribers and TAC, a cable network supplier. Therefore, the Court grants Time Warner and Comcast's motion to the extent Counts Three and Four are based on alleged harm to cable subscribers.

Time Warner and Comcast also contend that TAC lacks standing to pursue any claims contained in Counts Three and Four with respect to any alleged bid-rigging of the Time Warner-Comcast asset purchase. They point out that there are no facts to support the existence of an antitrust injury, especially given that the next highest bidder bid $500 million less than Time Warner and Comcast did. (*See* Compl. ¶ 29.) Second, assuming that there was an antitrust injury as a result of the bid-rigging, they contend that TAC lacks standing to pursue such claims because Adelphia's creditors, not TAC, would have been the targets of any bid-rigging.

10

In response, TAC focuses on Defendants' overall conduct, explaining that it has been "directly and seriously harmed" by Defendants' conduct because "the course of conduct and attendant harm of the Adelphia acquisition go well beyond bid-rigging, and are part and in furtherance of a larger conspiracy and anticompetitive conduct on the part of defendants." (TAC's Opp'n Mem. at 18.)  It contends that the "joint acquisition, division, and control of the Adelphia cable systems will have profoundly negative effects on TAC, which confer standing on TAC to maintain this action." (*Id*. at 21.) Specifically, it argues that the bid-rigging and acquisition of Adelphia deprives TAC of its ability to seek carriage from Adelphia and to reach at least 50 million cable subscribers, which is the minimum number needed to ensure its success as a network. (*Id*. at 21-22.)

Assuming all facts in the Complaint to be true and viewing them in the light most favorable to TAC, the Court agrees with Defendants that TAC lacks standing to bring claims based on alleged bid-rigging.  TAC has alleged no antitrust injury as a result of the alleged bid-rigging; in fact, it acknowledges in its Complaint that Time Warner and Comcast's bid was $500 million more than the next highest bidder.

Assuming that there was an antitrust injury, as the Bankruptcy Court observed, the only persons that would have been harmed from the bid-rigging would be Adelphia's creditors or Adelphia itself, not TAC.  TAC has not alleged any facts to establish how it suffered a direct injury as a result of the bid-rigging sufficient to confer standing.  As TAC acknowledges in its Complaint, nearly a year before the Time Warner-Comcast

asset purchase, Adelphia broke off negotiations with TAC to carry The American Channel on its cable system.  And, at some point before that, Time Warner and Comcast had also decided not to carry the channel on their systems.  TAC has not alleged facts to show how the asset purchase impacted its carriage on the cable systems of Time Warner, Comcast, or Adelphia, given that they had all denied carriage before the asset purchase. In this way, the purchase and subsequent division of markets did not cause any direct injury to TAC.  Finally, any allegations of consequential injury as a result of the market swaps in the Minneapolis/St. Paul area or elsewhere are simply too remote to confer standing because "consequential injury is not an antitrust injury."  *See Lovett v. Gen. Motors Corp.*, 975 F.2d 518, 520 (8th Cir. 1992).  Therefore, the Court grants Time Warner and Comcast's motion to the extent Counts Three and Four are based on alleged bid-rigging.

## IV.    Conspiracy Claim Under § 1 of the Sherman Act

Although TAC's Complaint is not a model in clarity, a liberal reading of the Complaint suggests that in Count Five, TAC alleges a claim Time Warner and Comcast conspired in an unreasonable restraint of trade in violation of § 1 of the Sherman Act. (Compl. ¶ 53.)  The alleged conspiracy appears to be based on the fact that both Time Warner and Comcast declined to carry The American Channel on their cable systems.

Section 1 of the Sherman Act provides, in relevant part, "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared illegal."

12

15 U.S.C. § 1.  To establish a claim under § 1 of the Sherman Act, a plaintiff must demonstrate that:  (1) there was a contract, combination, or conspiracy; (2) the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis; and (3) the restraint affected interstate commerce.  *Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 5 F. Supp. 2d 694, 703 (D. Minn. 1998).  It is possible to infer the existence of a contract, combination, or conspiracy "from consciously parallel conduct if that parallelism is accompanied by substantial additional evidence—often referred to as the 'plus factors.'"  *Id*. at 704 (internal citations omitted).

To adequately set forth a conspiracy, a plaintiff must show evidence "that reasonably tends to prove . . . a conscious commitment to a common scheme designed to achieve an unlawful objective."  *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 764 (1984).  It is crucial that a plaintiff demonstrate that there has been a contract, combination, or conspiracy between separate entities, because § 1 does not reach unilateral conduct even if such conduct unreasonably restrains trade.  *See Copperweld v. Independence Tube Corp.*, 467 U.S. 752, 767-68 (1984).

To support its claim that a conspiracy existed, TAC alleges "upon information and belief" that Time Warner's and Comcast's separate refusals to deal with TAC were "pursuant to an express or implied agreement, combination, or conspiracy, in that these parallel refusals to deal are accompanied by numerous plus factors."  (Compl. ¶ 41.) Based primarily on the Adelphia asset purchase, TAC alleges that:  (1) Defendants had a motive not to deal with independent networks, like TAC, which compete with

Defendants' own networks; (2) Defendants had opportunity because they regularly communicated with each other when they submitted their bid for the Adelphia assets; (3) Defendants would be at a competitive disadvantage if they had not agreed together to refuse to deal with TAC; (4) Defendants have expressed publicly the same reasons for refusing to deal with TAC (although those public reasons are not alleged); and (5) the swap of cable systems required Defendants to carry substantially the same programming. (*Id.*)

Time Warner and Comcast contend that TAC's plus factors are insufficient as a matter of law to state a claim upon which relief can be granted because they are vague and inconsistent. Many of the cases they rely upon, however, are decisions made at the summary judgment stage, after the parties have had ample time for discovery. TAC responds that Time Warner and Comcast are attempting to hold it to a heightened pleading standard. TAC contends that it sufficiently alleged that Defendants had an opportunity to jointly refuse to deal with TAC and other independent networks, when they bid on the Adelphia asset purchase together and subsequently divided and swapped their markets. TAC insists that its allegations are sufficient to establish the existence of a conspiracy because they tend to exclude the possibility that Time Warner and Comcast acted independently.

"The elements of a private antitrust claim must be alleged in more than vague and conclusory terms to prevent dismissal of the complaint on a defendant's Rule 12(b)(6) motion." *Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 558 (8th Cir.

1998); *see also Five Smiths, Inc. v. Nat'l Football League Players Ass'n*, 788 F. Supp.

1042, 1048 (D. Minn. 1992) (finding that "general allegations of conspiracy, without a

statement of the facts constituting the conspiracy, its objects and accomplishment are

inadequate to state a cause of action"); *Northwest Title & Escrow Corp. v. Edina Realty,

Inc.*, 1993 WL 593995 at *1 (D. Minn. Dec. 11, 1993) (explaining that a plaintiff must go

further than merely alleging a conspiracy existed; bare bones accusation of conspiracy

without any supporting facts is insufficient to state an antitrust claim).

Here, TAC's allegations of a conspiracy fail to state a claim upon which relief can

be granted.  TAC acknowledges that both Time Warner and Comcast decided not to carry

The America Channel before purchasing Adelphia's assets and that Adelphia had decided

not to carry The America Channel nearly a year before the asset purchase.  Yet, TAC's

main basis for its conspiracy allegations is that Time Warner and Comcast conspired

during the Adelphia purchase to agree not to carry The America Channel on their cable

systems and that they swapped and divided their cable systems markets in an attempt to

further this conspiracy so that they could exclude TAC and other independent networks

from appearing on their cable systems.  As TAC acknowledges in paragraph 17 of its

Complaint, however, Time Warner and Comcast had monopolies in local markets

throughout the country before the Adelphia purchase.  Therefore, Defendants have never

competed with one another in local markets, and consumers cannot choose between the

two.  Given this and the fact that carriage of a network is a national decision, TAC has not

alleged any facts to explain why, how, or for what purpose Time Warner and Comcast—

15

who do not compete with one another—would need to conspire together to deny carriage to TAC.

Taking away these inconsistent allegations, what remains are bare bones conclusory allegations that Time Warner and Comcast conspired together to not carry The America Channel on their cable systems.  Viewing these allegations in the light most favorable to TAC, they are insufficient to allege a claim of conspiracy because they fail to indicate a common schedule designed to achieve an unlawful motive and/or exclude the possibility of independent action.  *See  Insignia Sys., Inc. v. News Corp., Ltd.*, 2005 WL 2063890 at * 2 (D. Minn. Aug. 25, 2005).  Therefore, the Court grants Time Warner and Comcast's motion to dismiss with respect to Count Five. [4]

## V.     Monopolization Claims Under § 2 of the Sherman Act

In Counts Three and Four, TAC alleges claims against Defendants under § 2 of the Sherman Act for monopolization and attempted monopolization of the relevant cable systems market and cable network markets.  (Compl. ¶¶ 51-52.)  These claims asserting that Defendants were unilaterally motivated to deny TAC carriage are, to some extent, inconsistent with TAC's § 1 claims, in which TAC alleges that Defendants conspired to

---

[4]     The United States Supreme Court recently heard oral argument from an appeal concerning whether there is a heightened pleading requirement in antitrust actions.  *See Twombly v. Bell Atl. Corp.*, 425 F.3d 99, 108-09 (2d Cir. 2005), *cert. granted*, 126 S. Ct. 2965 (U.S. June 26, 2006) (No. 05-1126).  The decision from that appeal will not impact this Court's decision today because the Court finds that TAC's Complaint fails to state a claim under the standard imposed under Federal Rule of Civil Procedure 8.

(Footnote Continued on Next Page)

deny TAC carriage.

Section 2 of the Sherman Act provides, in relevant part, that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with another person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony." 15 U.S.C. § 2. To state a claim for unlawful monopolization, a plaintiff must establish that: (1) the defendant "possessed monopoly power in the relevant market" and that (2) the defendant "willfully acquired or maintained this monopoly power by anticompetitive conduct as opposed to gaining that power as a result "of a superior product, business acumen, or historical accident." *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1060 (8th Cir. 2000) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)). In order to establish a claim for unlawful attempt to monopolize, a plaintiff must prove (1) a specific intent by the defendant to control prices or destroy competition; (2) predatory or anticompetitive conduct undertaken by the defendant directed to accomplishing the unlawful purpose; (3) a dangerous probability of success; and (4) an injury reflecting the anticompetitive effect. *Gen. Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 801 (8th Cir. 1987).

Time Warner and Comcast contend that TAC has failed to state a claim under § 2 for two reasons: (1) failure to sufficiently define the relevant market and (2) failure to allege any unlawful exclusionary conduct by Defendants. The Court will consider each in

(Footnote Continued From Previous Page)

turn.

### A.    Relevant Market

In order to state a claim for monopolization or attempted monopolization under section 2 of the Sherman Act, a plaintiff must first identify a valid relevant market. *Double D*, 136 F.3d at 560.  The relevant market has two components:  a product market and a geographic market.  *Bathke v. Casey's Gen. Stores, Inc.*, 64 F.3d 340, 345 (8th Cir. 1995).  The product market refers to "all reasonably interchangeable products" or goods that exhibit a high cross-elasticity of demand.  *Double D*, 136 F.3d at 560.  The geographic market refers to "the geographic area in which consumers can practically seek alternative sources of the product."  *Id*.  The plaintiff has the burden to define the relevant market, and antitrust claims often rise or fall on the definition of the relevant market.  *Id*.

"Proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers."  *FTC  v. Tenet Health Care Corp.*, 186 F.3d 1045, 1052 (8th Cir. 1999) (citation omitted).  Nevertheless, because there is no "per se prohibition against dismissal of antitrust claims for failure to plead a relevant market," *Double D*, 136 F .3d at 560, courts have not hesitated to dismiss antitrust claims where it is clear that the alleged relevant market is too narrow, implausible, defined solely by franchise agreement, or simply not defined anywhere in the pleadings.  *See, e.g., Rolite, Inc. v. Wheelbrator Envtl. Sys., Inc.*, 958 F. Supp. 992, 997-99 (E.D. Pa. 1997) (reviewing relevant case law).

According to TAC, "[t]he Complaint defines a relevant product market (cable

systems)."[5]  (TAC Opp'n Mem. at 35.)  A cable system provides cable service that

includes video programming to multiple subscribers in a community primarily through a

franchise grant.  (Compl. at ¶ 12.)  TAC asserts that there are no reasonable substitutes for

cable systems.  (*Id.*, ¶ 13.)  It further explains that cable systems serve customers

equipped to receive multi-channel video programming distribution ("MVPD").  (*Id.*,

¶ 14.)  The percentage of MVPD customers served by cable systems varies, depending on

---

[5]      In its Complaint, TAC actually alleges two product markets:  the cable systems
market and the cable network market.  (Compl. at ¶ 11.)  It does not, however, direct any
of its § 2 allegations specifically to the cable network market.  In its opposition
memorandum, it appears to concede that it is alleging only the cable systems market, but
then it discusses in vague terms the cable network market.  (TAC Opp'n Mem. at 35,
38-39.)  To the extent TAC is basing its § 2 claims on the cable network market, they
must fail.

        TAC alleges that a cable network market is a supplier of video programming.  (*Id.*,
¶ 20.)  The geographic market for this product market is "primarily national, as cable
networks seek to reach as broad an audience as possible, with limited exceptions, such as
regional sports networks or purely public interest networks."  (*Id.*, ¶ 21.)  According to
TAC, there are at least 92 cable networks.  (*Id.*, ¶ 41.)  TAC asserts that Time Warner
owns, wholly or in part, nine networks, and Comcast owns six networks, plus "a number
of regional sports and news networks."  (*Id.*, ¶ 9.)  On its face, these allegations are
insufficient as a matter of law to state a claim for monopolization or attempted
monopolization because there is no allegation that Defendants possess the requisite
monopoly power in the cable network market or that there is a dangerous probability that
they will, especially given the percentage of the market controlled by Defendants.  *See,
e.g., Morgenstern v. Wilson*, 29 F.3d 1291, 1296, n.3 (8th Cir. 1994) (citing cases and
concluding as a matter of law that a 30% market share will not prove the existence of a
monopoly power); *Insignia*, 2005 WL 2063890 at *5 (dismissing claim for attempted
monopolization because plaintiff had not adequately pled a dangerous probability of
success).  For this reason, to the extent Counts Three and Four are based on the cable
network market, those claims fail to state a claim upon which relief can be granted.

the customers' locations and the availability of satellite and other MVPD providers.  (*Id.*, ¶ 14.)  TAC contends that the geographic market for the cable systems market is "primarily local and regional because cable franchises originally arose from grants by local authorities such as municipalities, and cable systems were constructed within the geographic limits of those grants.  The cable system market is national only in a sense that Time Warner and Comcast have achieved dominance on a nationwide basis."  (*Id.*, ¶ 16.)

Time Warner and Comcast assert that TAC has failed to sufficiently plead a relevant market because the relevant product market must involve other MVPD providers and because the Complaint fails to define the relevant geographic market.  TAC responds that it has sufficiently pled the relevant product market and that it has pled three separate geographic markets—local, regional, and national.

As defined by TAC, the cable system market is essentially a distribution market.  Although TAC uses the correct words such as "product market" and "geographic market," the actual factual allegations contained in the Complaint do not support its claims.  TAC wants the product market to be limited to cable systems, despite alleging in the Complaint that there are other MVPD suppliers that provide interchangeable products and who compete with Defendants in certain areas.  With respect to the geographic market, as currently defined, it is meaningless.  As applied to this situation, Webster's dictionary defines "local" to mean "of or relating to a particular place," and "regional" to mean "of or relating to a particular region."  *See Merriam-Webster Online* (http://www.m-w.com ).  TAC's Complaint fails to define that place or region to which

20

the adjectives local and regional apply; thus, the terms local and regional refer to nothing. Given this, TAC's Complaint fails to sufficiently allege a relevant product or geographic market.

### B.     Exclusionary Conduct

Assuming TAC has adequately alleged a relevant market and that Defendants possessed monopoly power or had the dangerous probability of success at gaining market power, Time Warner and Comcast contend that TAC's § 2 claims nonetheless fail because TAC has not alleged that Defendants engaged in any unlawful exclusionary conduct.  Defendants contend that TAC improperly relied on the "essential facilities" doctrine to support its § 2 claims when it alleged in paragraph 44 of the Complaint that Defendants have denied TAC and other independent networks access to "essential facilities, cable systems, which are under the control of Time Warner and Comcast." Relying on *Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004), Time Warner and Comcast contend that the essential facilities doctrine is inapplicable where state or federal regulatory agencies have effective power to compel sharing of the essential facility.  Because the FCC regulates cable systems, Defendants contend that TAC's reliance on the essential facilities doctrine is fatal to its § 2 claims.

Relying primarily on *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), TAC responds that "where an improper purpose underlies the refusal to deal and rivals are excluded on a basis other than efficiency, as here, the existence of a regulatory schedule for redress at the FCC does not bar TAC from proceeding under

traditional antitrust principles." (TAC Opp'n at 42.) TAC contends that it has stated

viable § 2 claims based solely on traditional principles established in older § 2 cases,

which are more factually similar to this situation, as opposed to the issue presented in

*Trinko*. (*Id*. at 43.) Because its Complaint does not allege that Defendants have violated

§ 2 by reason of their failure to comply with the Telecommunications Act of 1996, TAC

asserts that *Trinko* is inapplicable.

The essential facilities doctrine requires those in possession of facilities that cannot

practically be duplicated to share those facilities with their competitors. *City of Malden,*

*Mo. v. Union Elec. Co.*, 887 F.2d 157, 160 (8th Cir. 1989). To prevail under the essential

facilities doctrine, a plaintiff must establish: (1) control of an essential facility by a

monopolist; (2) the inability to practically or economically duplicate the facility; and

(3) the unreasonable denial of the use of the facility to a competitor when such use is

economically and technically feasible. *Id*.

In *Aspen Skiing*, the defendant owned three of the four mountains that made up the

Aspen downhill skiing market, and the plaintiff owned the fourth mountain. *Aspen*

*Skiing*, 472 U.S. at 590-91. For years, the defendant and the plaintiff had cooperated in

marketing a joint ticket to skiers that provided admission to all four mountains. *Id*. The

defendant repeatedly and unsuccessfully demanded a larger share of the proceeds from

the joint ticket and eventually refused to continue the cooperative arrangement. *Id*. at

591-93. The plaintiff tried to market its own multi-mountain ticket to replace the joint

ticket and even offered to buy the defendant's tickets at retail price, an offer the defendant

22

rejected.  *Id*. at 593-94.  The Supreme Court observed that the defendant had "elected to make an important change in a pattern of distribution that had originated in a competitive market and had persisted for several years."  *Id*. at 603.  Because the defendant's cooperation with the plaintiff would have entailed no cost to the defendant and indeed would have provided it with immediate benefits, and because consumers preferred the cooperative arrangement, the only apparent justification for the defendant's refusal to deal was anticompetitive malice.  *Id*. at 610.  Therefore, the Supreme Court concluded:  "Thus the evidence supports an inference that [the defendant] was not motivated by efficiency concerns and that it was willing to sacrifice short-run benefits and consumer goodwill in exchange for a perceived long-run impact on its smaller rival."  *Id*. at 610-11.

Here, there is no history of cooperation between TAC and Defendants to shed light on Defendants' motivations in refusing to deal with TAC.  Moreover, the Supreme Court has instructed that "*Aspen Skiing* is at or near the outer boundary of § 2 liability."  *Trinko*, 540 U.S. at 399.  Because TAC's claims are factually distinct from those in *Aspen Skiing*, TAC's reliance on that case is misplaced.

In *Trinko*, the United States Supreme Court explained some of the constraints imposed on the essential facility doctrine.  The Supreme Court emphasized that the "mere possession of monopoly power, and the concomitant charging of monopoly prices," does not constitute anticompetitive conduct that would establish the second element of a § 2 monopolization claim.  *Id.* at 407.  Because this requirement preserves the opportunity to charge monopoly prices, if only for a short period, it also preserves inducements to

innovate and apply business acumen.  *See id*.  For similar reasons, the Sherman Act

generally permits monopolists to choose those with whom they will deal.  *Id*.  A refusal to

deal can constitute anticompetitive conduct and violate § 2 under certain circumstances;

however, the Supreme Court has been "very cautious in recognizing such exceptions,

because of the uncertain virtue of forced sharing and the difficulty of identifying and

remedying anticompetitive conduct by a single firm."  *Id*.

The *Trinko* Court rejected the determination by the Second Circuit Court of

Appeals that the plaintiff had made out an essential facilities claim.  *Id*. at 410-11.  It

noted that it had never recognized or rejected the essential facilities doctrine; however, to

the extent such a doctrine exists, the plaintiff's allegations concerning Verizon's

provision of services to rivals did not make out an essential facilities claim.  The Supreme

Court reasoned that "[i]t suffices for present purposes to note that the indispensable

requirement for invoking the doctrine is the unavailability of access to the essential

facilities; where access exists, the doctrine serves no purpose.  Thus, it is said that

essential facility claims should . . . be denied where a state or federal agency has effective

power to compel sharing and regulate its scope and terms."  *Id*. at 411 (internal quotations

omitted).  Under the circumstances in *Trinko*, "the 1996 [Telecommunications] Act's

extensive provision for access makes it unnecessary to impose a judicial doctrine of

forced access."  *Id*.

"Antitrust analysis must always be attuned to the particular structure and

circumstances of the industry at issue."  *Id.*  Here, TAC does not dispute that the FCC

regulates access to the alleged facility.  Given the FCC's ability to regulate access to

cable systems, including those of Time Warner and Comcast, TAC cannot make out

any § 2 claims under the essential facilities doctrine because, where access exists, the

essential facility doctrine serves no purpose and claims based on that doctrine should be

denied.  *Id.*  Given this and TAC's failure to sufficiently plead a relevant market, the

Court grants Time Warner and Comcast's motion with respect to the remaining claims

contained in Counts Three and Four.

## CONCLUSION

TAC has alleged that it will not survive unless Time Warner and/or Comcast carry

The America Channel.  (Compl. ¶¶ 1, 26, 34-36.)  Interestingly, however, its request for

relief does not seek carriage of its network on Defendants' cable systems.  The Court has

difficulty seeing how an antitrust suit is in TAC's best interest, if its main goal is securing

carriage of its network on Defendants' cable system.  Moreover, as the Bankruptcy Court

observed, this Court understands why carriage on Time Warner and/or Comcast is

important to TAC, but it has difficulty seeing how the sale of Adelphia impacts carriage

of The America Channel on Time Warner or Comcast.  *In re Adelphia*, 345 B.R. at 74

n.3.

While a party is only required to make a short and plain statement of its claims, the

use of antitrust buzzwords, coupled with only vague and conclusory allegations of

antitrust violations, is insufficient to withstand a motion to dismiss.  As the Mock Turtle

remarked in *Alice's Adventures in Wonderland*, "What is the use of repeating all that stuff

. . . if you don't explain it as you go on?"  TAC may be able to state a claim upon which relief can be granted if it pleads a claim with sufficient facts.

Given this, the Court grants TAC leave to amend its Complaint to correct the deficiencies discussed above and to seek divesture with respect to Counts Three and Four (to the extent that they are *not* based on alleged harm to cable subscribers or alleged bid-rigging, they are *not* based on the cable network market, and the exclusionary conduct is *not* based on the essential facilities doctrine) and with respect to Count Five.  The Court expects TAC to set forth its claims in any Amended Complaint in a straightforward and clear manner.  If TAC chooses not to amend its Complaint, the Court will enter judgment after the time for leave expires.

Accordingly, **IT IS HEREBY ORDERED** that:

1.      Defendants' Motion to Dismiss Complaint (Doc. No. 19) is **GRANTED.**

2.      Counts One and Two are **DISMISSED WITH PREJUDICE.**

3.      Counts Three and Four are **DISMISSED WITH PREJUDICE**, to the extent that they are based on alleged harm to cable subscribers, alleged bid-rigging, the cable network market, or the essential facilities doctrine.

4.      Within 20 days from the date of this Order, TAC may amend its Complaint consistent with this Order.  If TAC chooses not to do so, the Court will dismiss the remaining counts without prejudice.


Dated:  January  17, 2007          s/Donovan W. Frank
                                   DONOVAN W. FRANK

26

Judge of United States District Court